UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

PAVLO PROTOPAPAS,

*Plaintiff,*

v.

SUNIL MADHU, individually; and
SM INFINITY ASSET HOLDINGS,

*Defendants.*

Civil Action No. _____

<u>**COMPLAINT**</u>

**JURY TRIAL DEMANDED**

Pavlo Protopapas ("Plaintiff") brings this complaint against Sunil Madhu ("Madhu" or "Borrower"), individually, and SM Infinity Asset Holdings (the "Trust") (collectively, "Defendants"), and alleges as follows:

<u>**NATURE OF THE ACTION**</u>

1.      This action arises from Defendant Sunil Madhu's systematic and ongoing breach of a Promissory Note and Agreement dated April 25, 2022 (the "Note"), as amended by an Amendment to Promissory Note and Agreement dated May 14, 2024 (the "Amendment," and together with the Note, the "Agreement"), attached as **Exhibit 1**, pursuant to which Plaintiff Pavlo Protopapas lent Madhu $7,750,000 in exchange for Madhu's promise to reserve and ultimately transfer 2,500,000 shares of common stock (the "Note Payment SM Stock") in Socure, Inc. ("Socure" or the "Company"), a Delaware corporation, to the Plaintiff.

2.      In direct violation of the Agreement's express prohibition on transferring, pledging, encumbering, or conveying any of the Note Payment SM Stock, Madhu transferred more than 80% of his approximately 5.5 million Socure shares—including the Note Payment SM Stock reserved for Plaintiff—into a family trust, where the shares are held for the benefit of Madhu's children.

Since then, Madhu has sold nearly 1.5 million shares from the trust and 500,000 shares from his personal holdings, and has attempted to sell yet another 470,000 shares.

3.      Madhu's actions constitute a flagrant breach of Section 5(a) of the Agreement, which required him to hold the Note Payment SM Stock in his own name and have it registered solely and exclusively in his name on Socure's books and records. By transferring the shares to a trust that Madhu now claims is "no longer [his] property" and is "managed by trustees" independent of him, Madhu has placed the very shares he is contractually obligated to deliver to Plaintiff beyond his own control—or at least has claimed to have done so. The result is an untenable contradiction: Madhu simultaneously asserts that the shares are safe in the Trust for Plaintiff's benefit, but that the Trust is beyond his control and holds shares for his family. Either way, Plaintiff's rights are in jeopardy.

4.      Madhu's conduct is an Event of Default under Section 6(a)(i) of the Agreement. Upon an Event of Default, Plaintiff is entitled under Section 6(c) to all rights and remedies against the Borrower, including the right to require Madhu to maintain the shares in his name and transfer them when such transfer is permitted under Socure's transfer restrictions. The urgency of this action cannot be overstated: Madhu has already sold nearly two million shares and is actively attempting to sell more. If the shares he still holds in his own name are liquidated, and the Trust's remaining shares are dissipated or remain under the control of trustees who disclaim any obligation to Plaintiff, there will be nothing left to transfer.

5.      The 2,500,000 shares of Note Payment SM Stock at issue are shares of common stock in Socure, a private company without a public market share valuation but which is expected to go public in a highly valued IPO in the near future. By breaching the Agreement and dissipating

2

the shares, Madhu seeks to avoid his obligation to transfer shares that will be worth significant amounts upon IPO, and to deprive Plaintiff of the benefits of the deal he struck. All the while, Madhu has repeatedly acknowledged—in his own words, as recently as December 2025—that the Agreement's purpose was for Plaintiff to receive the shares, that Madhu's obligation to hold them was "perpetual until the IPO," and that the shares were "ring fenced" for Plaintiff's benefit.

6. Plaintiff brings this action seeking highly tailored relief: (a) injunctive relief to prevent further dissipation of the shares; (b) an order requiring Madhu to cause the return of the Note Payment SM Stock from the family trust to his own name (or into escrow); (c) specific performance of the share transfer obligation under Section 6(c) of the Agreement; (d) imposition of a constructive trust over the Note Payment SM Stock for Plaintiff's benefit; (e) a declaration that the transfer to the family trust violated Section 5(a) and is void and/or constitutes a fraudulent conveyance; and/or (f) damages measured by the fair market value of the shares.

## THE PARTIES

7. Plaintiff Pavlo Protopapas is an individual residing at 10 rue des Murs, Coppet 1296, Geneva, Switzerland.

8. Defendant Sunil Madhu is an individual residing at 431 W. 37th Street, Apt. 2B, New York, New York 10018. Madhu is the "Borrower" under the Agreement and the grantor of the Trust. Madhu is a citizen and resident of the State of New York.

9. Defendant SM Infinity Asset Holdings is a family trust organized under the laws of the State of Delaware, administered by Bryn Mawr Trust Company and managed by JP Morgan Private Wealth. Upon information and belief, the Trust currently holds 3,143,333 shares of Socure common stock, including the Note Payment SM Stock reserved for Plaintiff under the Agreement. The Trust is named as a necessary party and relief defendant because it holds property that Madhu

3

was contractually prohibited from transferring to it, and complete relief cannot be granted without the Trust's participation.

## JURISDICTION AND VENUE

10. This Court has subject matter jurisdiction under 28 U.S.C. § 1332(a) because there is complete diversity of citizenship between the parties and the amount in controversy exceeds $75,000 exclusive of interest and costs. Plaintiff is a citizen of Switzerland. Madhu is a citizen of the State of New York. The Trust is a citizen of the State of Delaware (the state of its formation) and/or the State of New York (the state of Madhu's residence as grantor).

11. This Court also has jurisdiction because Madhu irrevocably and unconditionally submitted to the exclusive jurisdiction of New York State courts or United States federal courts sitting in the City of New York under Section 14(b) of the Agreement.

12. Venue is proper in this District under 28 U.S.C. § 1391(b) because a substantial part of the events giving rise to the claim occurred in this District, Madhu resides in this District, and because Section 14(b) of the Agreement provides for exclusive jurisdiction in courts sitting in the City of New York, New York.

13. While Madhu irrevocably and unconditionally waived his right to request a trial by jury in any legal action or proceeding relating to the Agreement under Section 14(c), Plaintiff did not, and as such demands a jury trial for all claims.

## FACTUAL BACKGROUND

### A.     The Promissory Note and Agreement

14. Socure is a Delaware corporation that provides digital identity verification and fraud prevention technology. Madhu is the founder and former Chief Executive Officer of Socure. Plaintiff is an early investor who held preferred stock in the Company.

4

15.   Pursuant to Stock Option Agreements granted under Socure's Omnibus Incentive Plan, Madhu had options to purchase 9,979,632 shares of Socure common stock (the "SM Stock Agreements Stock"). The first stock option grant, dated November 17, 2014, gave Madhu the right to purchase up to 6,758,421 shares at an exercise price of $0.07 per share. The second stock option grant, dated June 1, 2018, gave Madhu the right to purchase up to 3,221,211 shares at an exercise price of $0.11 per share.

16.   Madhu needed capital to exercise these stock options and cover the resulting tax liability. Plaintiff agreed to fund Madhu's exercise of the options by advancing Madhu money in exchange for Madhu's promise to reserve 2,500,000 shares of the resulting stock (the "Note Payment SM Stock") and to transfer those shares to Plaintiff when transfer restrictions on the stock were lifted.

17.   To finance the advance to Madhu, Plaintiff sold 2,500,000 of his own preferred shares in Socure, generating the capital to fund the Principal Amount. The Agreement expressly memorializes this in the Recitals: "[Plaintiff] sold 2,500,000 shares of preferred stock in the Company to fund the Principal Amount." Plaintiff thus divested himself of a direct ownership position in Socure in reliance on Madhu's promise to transfer 2,500,000 common shares upon the lifting of restrictions. The symmetry—2,500,000 shares sold, 2,500,000 shares to be received—was by design.

18.   On April 25, 2022, Madhu and Plaintiff executed the Note via DocuSign. The original Principal Amount was $11,250,000. Under Section 14(a) of the Agreement, the Note was governed by the laws of the State of New York.

19.     On May 14, 2024, the parties executed the Amendment, which reduced the Principal Amount to $7,750,000. The Amendment provides that "[e]xcept as expressly amended hereby, all terms and conditions of the Note shall remain in full force and effect."

20.     From the outset, and up until at least December 2025, all parties understood the express goal of the Agreement was for Plaintiff to receive, in return, the shares—not any other type of consideration.

21.     In a text exchange between Plaintiff's wife and Madhu on February 16, 2025, Madhu wrote that:

- "Per our agreement I'm required to hold on to 2.5M of my shares until Socure IPOs when the right of first refusal restrictions on my stock automatically fall away."

- "The shares in trust will be released per the terms of our agreement once the ROFR restrictions are lifted by the company. My hope is that the company will IPO in 2026 when this transaction will conclude."

- "[Plaintiff] has a legal agreement that shows that I agreed to transfer those shares to him upon restrictions being lifted"

22.     In that exchange, Madhu expressly said that it was his understanding that Plaintiff's right to such shares was perpetual, writing "AFAIK [as far as I know] its perpetual until the IPO."

23.     Likewise, in text exchanges between the same parties, nine months later, on December 15, 2025, Madhu once again confirmed this understanding, stating: "Our contract hasnt expired"; "It doesn't have an expiry"; "Our agreement was a simple and straightforward one"; and "What I signed when I agreed to structure a forward sale with [Plaintiff]."

**B.     The Agreement Reflects the Parties' Intentions**

24.     The Agreement establishes two separate pathways that govern the relief and remedies that are available to Plaintiff. In instances where Madhu has not defaulted on the Agreement, Plaintiff was entitled to either cash payment or share transfer depending on Socure's

IPO trajectory. In instances where Madhu did default, however, Plaintiff was vested with broad rights to elect whether to demand immediate repayment or to wait for a Socure IPO, and was entitled to all rights available at law and equity to enforce that election.

25.    Specifically, under Section 2(a) of the Agreement, assuming Madhu is not in default, two forms of repayment may occur, based entirely on the timeline of Socure's IPO:

    a.    **Cash Payment (Section 2(a)(i)).** If the Maturity Date is a date other than the date of (A) a Qualified IPO or (B) the lifting of all restrictions on transfer of Transfer Stock to a Permitted Transferee, the Obligations shall be paid in USD by wire transfer.

    b.    **Share Transfer (Section 2(a)(ii)).** If the Maturity Date is either the date of (A) a Qualified IPO or (B) the lifting of all transfer restrictions on Transfer Stock, the Obligations shall be paid by Madhu "tendering and transferring the Note Payment SM Stock to the [Plaintiff], executing and delivering an assignment of the Note Payment SM Stock to [Plaintiff], and executing and delivering all documents requested by [Plaintiff] in order to transfer the Note Payment SM Stock to [Plaintiff]."

26.    The "Maturity Date" is defined in Section 8(i) as the *earliest* of six possible trigger dates: (i) the Fixed Date (either December 31, 2024 or a later date picked by Plaintiff in its sole discretion upon written notice by December 15, 2024); (ii) the date of a Qualified IPO; (iii) the date of a Sale of the Company; (iv) the termination of the Amended Stockholders Agreement; (v) the date all transfer restrictions are satisfied or terminated; and (vi) the date Plaintiff sends written notice of an Event of Default demanding payment.

27.    However, if Madhu defaulted on the Agreement, the Agreement contemplates Plaintiff's rights greatly expanding, increasing Plaintiff's optionality to decide whether to receive monetary repayment or continue to wait for a Socure IPO. These set of options are provided for in Section 6 of the Agreement.

28.    Section 6(a)(i) provides that any breach of a representation, warranty, covenant, or other statement made by the Borrower that is false or misleading in any material respect constitutes an Event of Default.

29.    Section 6(b) provides that upon an Event of Default, Plaintiff has the right to declare all Obligations immediately due and payable by written notice.

30.    Section 6(c) provides that upon an Event of Default, in addition, Plaintiff shall have "all rights and remedies against the Borrower under this Note and Agreement, at law and in equity including the right to recover from the Borrower all costs and other expenses incurred in connection therewith, including reasonable attorneys' fees."

31.    Finally, Section 6(c) further provides: "*Without limiting the foregoing*, at any time on and after the occurrence of the Maturity Date *described* in Section 2(a)(ii), [Plaintiff] shall have the right to enforce the transfers and deliveries to be made by Madhu set forth therein."

32.    The "Maturity Date described in Section 2(a)(ii)" refers to "the date (A) of the consummation of a Qualified IPO, or (B) that all restrictions with respect to a transfer of Transfer Stock to a Permitted Transferee have been satisfied or terminated." Inserting this into Section 2(a)(ii) results in the following reading:

> Without limiting the foregoing, at any time on and after "consummation of a Qualified IPO, or (B) that all restrictions with respect to a transfer of Transfer Stock to a Permitted Transferee have been satisfied or terminated," [Plaintiff] shall have the right to enforce the transfers and deliveries to be made by Madhu set forth therein.

33.    Thus, upon an EOD, Plaintiff may: (a) immediately force repayment; (b) pursue any remedies provided for by the note, law, or equity; or (c) wait until a qualified IPO or lift of

8

transfer restriction on Socure public stock and force Madhu to transfer the 2,500,000 shares to him.

34. Furthermore, Section 11 provides that all rights and remedies shall be cumulative and may be pursued singly, successively, or together at the sole discretion of Plaintiff. The failure of Plaintiff to exercise any right or remedy shall in no event be construed as a waiver or release thereof.

35. Section 12 provides that the Agreement shall be liberally construed in favor of Plaintiff.

36. Section 13 provides that the Borrower shall reimburse Plaintiff for any sums, costs, and expenses, including reasonable attorneys' fees, incurred in enforcing payment of the Obligations. As other sections of the Agreement make clear (*e.g.*, Section 2(a)(ii)), Madhu's transfer of the Note Payment SM Stock to Plaintiff would constitute payment of the Obligations.

**C.    Madhu Breaches the Agreement, Establishing an Event of Default**

37. Pursuant to Section 5(a), Madhu was obligated not to transfer the 2.5 million shares in any way and to maintain those shares *in his name* throughout the pendency of the Agreement.

38. Specifically, Section 5(a) states:

> The Borrower shall (i) ***not, grant an option, transfer, pledge, encumber or otherwise convey or grant any rights in or to any of the Note Payment SM Stock Agreements Stock***, and (ii) hold all Note Payment SM Stock Agreements Stock ***in his own name***, and shall have the Company register in its books and records all Note Payment SM Stock Agreements Stock registered solely and exclusively in Borrower's name.

39. Section 6(a)(i) provides that any breach of a representation, warranty, covenant, or other statement made by the Borrower that is false or misleading in any material respect constitutes an Event of Default.

40.     On or about August 1, 2024, Madhu transferred substantially all of his Socure shares—including the Note Payment SM Stock—to the Trust, which is a family trust organized under the laws of Delaware and administered by Bryn Mawr Trust Company, with JP Morgan Private Wealth providing wealth management services. The transfer was evidenced by Certificates C-1657, C-1658, and C-1660, reflecting 1,175,000, 1,984,066, and 1,434,267 shares, respectively, for a total of 4,593,333 shares transferred to the Trust. Madhu retained only 968,731 shares in his personal name (Certificate C-1659), necessarily confirming a breach of his obligation to maintain the 2,500,000 shares *in his name* and not to transfer them.

41.     This transfer was made in direct violation of Section 5(a) of the Agreement, which expressly prohibited Madhu from transferring, pledging, encumbering, or otherwise conveying any of the Note Payment SM Stock and required Madhu to hold all such stock in his own name.

42.     Upon information and belief, the Trust was established for the benefit of Madhu's children. Madhu has described the Trust as a "family trust" and has stated that the shares in the Trust are "not longer [his] property" and are "managed by trustees" independent of him.

43.     There is no dispute that Madhu made these transfers and the shares are not held in his name but rather in the Trust.

44.     Indeed, Madhu repeatedly admitted in writing that he had transferred the shares to the Trust.

45.     On February 16, 2025, Madhu wrote that he had "put[] all my shares for my kids and those earmarked for [Plaintiff] in my family trust."

46.     Likewise, on December 17, 2025, Madhu wrote to Plaintiff: "I told you I had put my shares per my agreement ring fenced in a trust which I did." He continued: "I am selling the

last of my shares held outside of my trust because I cannot sell the shares I ring fenced." He further stated: "They are in my family trust," and "[t]he trust holds roughly 3.4M shares," and "You have just acknowledged that there are more than 2.5M shares in the trust," and "Yet you know I have more than 2.5M shares still in the trust," and "You literally know that I hold the requisite shares as agreed in my trust."

47.    By his own admissions, Madhu transferred the shares to his family trust, in direct violation of Section 5(a)'s prohibition on transfers of the shares and/or registering them in another name.

48.    Upon information and belief, as of February 19, 2025, the Trust held 4,593,333 shares, whereas Madhu only held 968,731, confirming Madhu's statement that he had transferred the 2,500,000 shares out of his name and to the Trust.

49.    Likewise, upon information and belief, as of November 18, 2025, the Trust held 3,143,333 shares while Madhu only held 468,731.

50.    These holding distributions are extremely troubling because they confirm that Madhu misrepresented his holdings when, on December 17, 2025, he showed Plaintiff a purported screenshot of his trust holdings showing 4,593,333 shares when, in fact, it had already been dissipated to 3,143,333.

51.    Madhu's transfer of the Note Payment SM Stock to the Trust constitutes a breach of Section 5(a) of the Agreement and is an Event of Default under Section 6(a)(i).

**D.    Madhu's Dissipation of the Trust and His Personal Shares**

52.    On or about March 18, 2025, Madhu caused the Trust to sell 1,450,000 shares of Socure common stock to Industry Ventures Secondary X, L.P.—comprising 750,000 shares from

Certificate C-1657 at $4.00 per share and 700,000 shares from Certificate C-1658 at $5.00 per share—for total proceeds of approximately $6,500,000.

53.    On or about August 21, 2025, Madhu sold 500,000 shares of Socure common stock from his personal holdings (Certificate C-1659) to Commerce Ventures at $4.00 per share for total proceeds of approximately $2,000,000.

54.    As a result of these sales, the Trust's holdings were reduced from 4,593,333 shares to 3,143,333 shares. Madhu's personal holdings were reduced from 968,731 shares to 468,731 shares. The aggregate shareholding went from 5,562,064 shares to 3,612,064 shares—a reduction of nearly two million shares.

55.    In or around December 2025, Madhu sought to sell approximately 470,000 additional shares to Commerce Ventures. Upon information and belief, this proposed sale was from Madhu's remaining personal holdings. If completed, it would reduce Madhu's personal holdings to zero, leaving only the Trust's 3,143,333 shares—of which 2,500,000 are owed to Plaintiff.

56.    Under the Agreement, Madhu was required to maintain the 2,500,000 shares in his own name, and was prohibited from transferring them. While Madhu's purported transfer of the 2.5 million shares would constitute a breach and an event of default, Madhu's transfer of the remaining shares in his name to third parties also constitutes violation of the Agreement, which prohibited him from transferring any shares in his name. The Agreement's purpose—to ensure that 2,500,000 shares would be available for transfer to Plaintiff—is thus being defeated by Madhu's own actions.

### E.    Madhu's Misrepresentations About the Trust and Share Holdings

57.    Not only has Madhu dissipated both his own personal and the Trust's assets, which were wrongfully commingled to obscure Plaintiff's earmarked 2,500,000 shares, but Madhu has repeatedly made contradictory and misleading statements to Plaintiff regarding the status of the Note Payment SM Stock and the Trust:

a.    Madhu repeatedly assured Plaintiff that the shares were "ring fenced" and "secure." As early as June 18, 2023, Madhu wrote to Plaintiff: "Yes your shares are secure." On December 15, 2025, Madhu stated: "[Plaintiff's] interests are protected by my shares in escrow in the trust with the instructions [Plaintiff] and I agreed on." On February 16, 2025, Madhu stated: "His shares are parked alongside shares for my kids in my trust."

b.    Yet Madhu simultaneously claimed the Trust was "no longer [his] property" and was an independent vehicle beyond his control. On December 17, 2025, Madhu wrote: "Anyway the trust is managed by trustees and is no longer my property." When Plaintiff demanded that the Trust acknowledge the shares owed to Plaintiff, Madhu stated: "They are in my family trust"—suggesting the shares were held for Madhu's family, not for Plaintiff.

c.    On December 17, 2025, Madhu sent Plaintiff a document purporting to show that the Trust held 4,593,333 shares. In fact, by that date, 1,450,000 shares had already been sold from the Trust in March 2025, reducing the Trust's holdings to 3,143,333 shares. Madhu's representation was materially false and misleading. Plaintiff had access to the Company's capitalization table and was able to detect the discrepancy.

d.    Madhu threatened that if Plaintiff pursued legal action, Madhu would simply "liquidate my shares and pay [Plaintiff] back his 7.3M."

### F.    Madhu's Failure to Provide Trust Documentation

58.    From August 2024 through December 2025, Plaintiff made approximately fifty documented requests to Madhu for the Trust deed, Trust agreement, and documentation confirming that the Note Payment SM Stock held in the Trust was reserved and assigned to Plaintiff. These requests are documented in contemporaneous WhatsApp messages between the parties and between Plaintiff's wife, Lara Protopapas, and Madhu.

13

59.     Madhu consistently stalled, delayed, and ultimately refused to produce the requested documentation. Madhu's excuses included: waiting on counsel, waiting on his bankers, being busy at work, dealing with family emergencies, and claiming that his trustees and attorneys had concerns about proposed changes to the Agreement. On no occasion did Madhu produce the Trust deed or any document confirming that the Trust recognized Plaintiff's interest in the 2,500,000 shares.

**G.      Madhu Threatens to Liquidate the Trust if Plaintiff Seeks to Assert his Rights**

60.     Perhaps the most fundamental underlying commitment of the Agreement was that Madhu would set aside 2.5 million shares for Plaintiff and transfer them to Plaintiff when those shares were transferrable.

61.     Indeed, Madhu repeatedly recognized this was both his understanding and the purpose of the Agreement.

62.     On February 16, 2025, Madhu wrote to Lara Protopapas that "[Plaintiff] has a legal agreement that shows that I agreed to transfer those shares to him upon restrictions being lifted." In that same conversation, Madhu explained that "Per our agreement I'm required to hold on to 2.5M of my shares until Socure IPOs when the right of first refusal restrictions on my stock automatically fall away," and described the arrangement as a "forward sale agreement."

63.     Likewise, in another part of that conversation, Madhu confirmed that he had "fulfilled my agreement with [Plaintiff] by putting all my shares for my kids and those earmarked for [Plaintiff] into my family trust," and stated that "the shares in trust will be released per the terms of our agreement once the ROFR restrictions are lifted by the company." He also told Lara Protopapas that "there is no way for me to transfer my shares to [Plaintiff] directly in the interim,

other than to hold them in escrow in the trust till the company exits, which [Plaintiff] full well knows and agreed to." And he confirmed the Agreement was "perpetual until the IPO."

64. On May 22, 2024, Madhu described the ring-fenced shares as "Non-recourse financing 9% collateral (ring fenced shares)."

65. On December 15, 2025, Madhu wrote to Lara Protopapas: "My lawyers also inform me that the contract [Plaintiff] and I have as of 2021 is still binding." He confirmed: "Our contract hasn't expired" and "It doesn't have an expiry." He acknowledged that "What I signed when I agreed to structure a forward sale with [Plaintiff]" remained in effect.

66. That same day, Madhu wrote: "[Plaintiff's] interests are protected by my shares in escrow in the trust with the instructions [Plaintiff] and I agreed on." He stated: "My shares for my kids and the ring fenced collateral are in my trust" and explained: "It's ring fence[d] because it's a non-grantor trust." He also confirmed that "The ROFR restrictions on my shares that were added by the settlement are still in place," and that he would not want a "sale forced prior to IPO because it has severe tax ramifications for me." He further stated: "When I sell, [Plaintiff] can see where my shares come from because the company discloses that in the ROFR notice."

67. On December 17, 2025, Madhu wrote to Plaintiff: "I told you I had put my shares per my agreement ring fenced in a trust which I did." He stated: "I am selling the last of my shares held outside of my trust because I cannot sell the shares I ring fenced." He confirmed: "You literally know that I hold the requisite shares as agreed in my trust."

68. On the same date, he said: "I faithfully did what [Plaintiff] asked and put my shares ring fenced in my trust so [Plaintiff] knows. Because Socure has restricted my shares (which [Plaintiff] knows), I have to go through Right of First Refusal and gain company permission in order

to transfer my shares. Given these very same restrictions the shares remain in the trust until those restrictions are lifted and the trustees are able to action the trust. This was done under [Plaintiff] and my explicit agreement to wait till IPO or those restrictions are lifted." He also confirmed that the shares he was selling separately "are not the shares [Plaintiff] asked me to sequester," and that "the ring fenced shares are exactly where they are" and "where I agreed to [put] them."

69.     Despite Madhu's recognition of the Agreement's clear purpose, beginning late December, as Plaintiff and his wife began to express concerns about Madhu's continuous dissipation of Trust and personal assets, Madhu changed his tune and instead suggested that he might just liquidate all of the shares in his Trust and just "repay" Plaintiff the $7 million.

70.     Madhu wrote this expressly in a December 15, 2025 text, saying that "Perhaps the best thing to do is liquidate my shares and pay [Plaintiff] back his 7.3M."

71.     Of course, the Agreement expressly prohibits Madhu from unilaterally selecting such an outcome, as it gives *Plaintiff* the right to choose between three different remedies upon an Event of Default (which occurred in August 2024 when Madhu breached Section 5(a) by transferring substantially all of his Socure shares, including the Note Payment SM Stock, to the Trust).

72.     But moreover, Madhu's own messages make clear he has understood the Agreement's obligation for him to hold the 2,500,000 shares for Plaintiff to be perpetual, continuing, and non-dischargeable.

73.     On February 16, 2025, Madhu wrote to Lara Protopapas: "AFAIK it's perpetual until the IPO." He also stated: "And the contract still remains in force." In that same conversation, Madhu acknowledged: "[Plaintiff] still has an obligation under that as do I."

74. On February 16, 2025, Madhu further wrote: "Per our agreement I'm required to hold on to 2.5M of my shares until Socure IPOs when the right of first refusal restrictions on my stock automatically fall away." He explained: "there is no way for me to transfer my shares to [Plaintiff] directly in the interim, other than to hold them in escrow in the trust till the company exits, which [Plaintiff] full well knows and agreed to."

75. On December 15, 2025, Madhu wrote to Lara Protopapas: "My lawyers also inform me that the contract [Plaintiff] and I have as of 2021 is still binding." He stated: "Our contract hasn't expired" and "It doesn't have an expiry." He also confirmed: "The ROFR restrictions on my shares that were added by the settlement are still in place."

76. On December 17, 2025, Madhu wrote to Plaintiff directly: "My trust will keep all of the shares until the company goes public." He also wrote: "the shares remain in the trust until those restrictions are lifted and the trustees are able to action the trust. This was done under [Plaintiff] and my explicit agreement to wait till IPO or those restrictions are lifted."

77. On December 17, 2025, Madhu further confirmed: "I am selling the last of my shares held outside of my trust because I cannot sell the shares I ring fenced." And: "the ring fenced shares are exactly where they are" and "where I agreed to [put] them."

78. And yet, Madhu now claims he can sell the shares whenever he wants and only needs to repay Plaintiff $7 million, despite knowing that the value of the shares is significantly greater now and will be enormously more valuable upon an IPO, which is expected in 2026 or 2027.

79. Indeed, in early March, Madhu's lawyer reached out to Plaintiff's British counsel regarding how he could pay Plaintiff $7 million, making clear he was following through on his stated intention to substitute a cash payment for the shares owed to Plaintiff.

80.    Madhu has thus left Plaintiff with no choice but to bring this action.

81.    Madhu has already sold 1,450,000 shares out of the Trust—shares he was contractually obligated to hold for Plaintiff—and an additional 500,000 shares from his personal holdings, in open violation of Section 5(a) of the Agreement. He is now attempting to sell yet another 470,000 shares to Commerce Ventures, and has taken the position that he is free to sell his shares to whomever he pleases, whenever he pleases.

82.    At the same time, Madhu claims that the Trust "is no longer my property" and is "managed by trustees" over whom he has no control—meaning that if Madhu is to be believed, the personal shares he is now racing to liquidate are the last shares over which he exercises any authority whatsoever. Every share sold is one that cannot be recovered.

83.    Plaintiff therefore brings claims for breach of the Agreement's negative pledge, unjust enrichment, and fraudulent conveyance, and seeks specific performance, imposition of a constructive trust, and a declaratory judgment that the Agreement remains in full force and effect.

## CAUSES OF ACTION

### COUNT I
Breach of Contract — Section 5(a)
(*Against Defendant Sunil Madhu*)

84.    Plaintiff repeats and re-alleges each and every allegation set forth in the preceding paragraphs as if fully set forth herein.

85.    The Agreement constitutes a valid and binding contract between Plaintiff and Madhu.

86.    Section 5(a) of the Agreement expressly prohibits Madhu from transferring, pledging, encumbering, or otherwise conveying any of the Note Payment SM Stock and requires

Madhu to hold all such stock in his own name, registered solely and exclusively in his name on the Company's books and records.

87.    Madhu breached Section 5(a) by transferring substantially all of his Socure shares, including the Note Payment SM Stock, to the Trust on or about August 1, 2024.

88.    Madhu separately breached Section 5(a) by transferring Socure shares that were kept in his name and not transferred to the Trust to third-parties.

89.    Madhu's breach is ongoing and material, and constitutes an Event of Default under Section 6.

90.    Pursuant to Section 6(c), upon the occurrence of an Event of Default, Plaintiff is entitled to exercise "all rights and remedies available at law or in equity."

91.    Given that Madhu has already dissipated nearly 2,000,000 shares through sales to Industry Ventures and Commerce Ventures, is actively attempting to sell an additional 470,000 shares, and has simultaneously claimed that the Trust is "no longer my property" and beyond his control—raising grave doubt as to whether 2,500,000 shares even remain available for transfer to Plaintiff—Plaintiff is entitled to exercise those rights and remedies to their fullest extent.

92.    Specifically, Plaintiff seeks an order: (a) directing Madhu and/or the Trust to place no fewer than 2,500,000 shares of Socure common stock into an independent escrow, to be held pending the lifting of the ROFR restrictions or the consummation of an IPO, at which time such shares shall be transferred to Plaintiff; (b) avoiding and reversing any wrongful transfers of the Note Payment SM Stock, whether to the Trust or to third parties, to the extent necessary to reconstitute the 2,500,000 shares to which Plaintiff is entitled; (c) preliminarily and permanently enjoining Madhu, the Trust, and their agents from transferring, selling, pledging, encumbering, or

otherwise disposing of any Socure shares until Plaintiff's rights under the Agreement are fully secured; and (d) granting such other and further relief as this Court deems just and proper.

## COUNT II
### Unjust Enrichment
(*Against Defendant Sunil Madhu, in the alternative*)

93.     Plaintiff repeats and re-alleges each and every allegation set forth in the preceding paragraphs as if fully set forth herein.

94.     In the alternative, to the extent the Agreement is found to be unenforceable or inapplicable to any of Plaintiff's claims, Madhu has been unjustly enriched.

95.     Plaintiff conferred a benefit on Madhu by paying $7,750,000 to fund Madhu's exercise of stock options. Madhu accepted and retained this benefit, and repeatedly recognized that the purpose of the deal and his obligations under it required him to provide 2,500,000 Socure shares to Plaintiff.

96.     Madhu has now taken the position that he does not need to transfer 2.5 million shares, and rather can simply return the $7,750,000 to satisfy his obligations to Plaintiff.

97.     Such an outcome would be unequitable and unjust, as Madhu had agreed to provide Plaintiff with 2,500,000 shares, which are likely to have significant value after Socure's IPO.

98.     Plaintiff is entitled to restitution in an amount to be determined at trial.

## COUNT III
### Declaratory Judgment
(*Against All Defendants*)

99.     Plaintiff repeats and re-alleges each and every allegation set forth in the preceding paragraphs as if fully set forth herein.

20

100.    An actual, justiciable controversy exists between the parties regarding the interpretation and enforceability of Section 6(c) of the Agreement, the validity of the transfer of the Note Payment SM Stock to the Trust under Section 5(a), and Madhu's obligations to Plaintiff.

101.    Plaintiff seeks a declaration pursuant to 28 U.S.C. § 2201 that: (a) Madhu is in breach of the Agreement; (b) Events of Default have occurred under Section 6(a)(i); (c) Plaintiff's right to enforce all remedies available under the Agreement, at law, and at equity have vested and are available now;  (d) Plaintiff's right to enforce the share transfer under Section 6(c) is vested and will become exercisable upon the occurrence of a Section 2(a)(ii) event; (e) the transfer of the Note Payment SM Stock to the Trust violated Section 5(a) of the Agreement; and (f) Madhu is obligated to cause the return of the Note Payment SM Stock from the Trust to his own name or directly to Plaintiff.

**COUNT IV**
New York Uniform Voidable Transactions Act
(*Against All Defendants*)

102.    Plaintiff repeats and re-alleges each and every allegation set forth in the preceding paragraphs as if fully set forth herein.

103.    At the time Madhu transferred the Note Payment SM Stock to the Trust on or about August 1, 2024, Madhu was indebted to Plaintiff in the amount of $7,750,000 under the Agreement, as amended.

104.    Madhu transferred the Note Payment SM Stock to the Trust without receiving reasonably equivalent value in exchange. The Trust is a family trust established for the benefit of Madhu's children.

105.    Madhu made the transfer with actual intent to hinder, delay, or defraud Plaintiff as a creditor, as evidenced by: (a) Madhu's concealment of the Trust's terms and his refusal to

21

produce the Trust deed despite approximately fifty requests; (b) Madhu's contradictory statements about whether the shares were "reserved" for Plaintiff or held for Madhu's family; (c) Madhu's subsequent sales of shares from the Trust to third parties; (d) Madhu's false representation about the number of shares in the Trust; and (e) Madhu's stated intention to "liquidate my shares and pay [Plaintiff] back his 7.3M" rather than transfer the shares.

106. In the alternative, the transfer was constructively fraudulent because Madhu transferred the shares without receiving reasonably equivalent value while he was obligated to hold those shares for Plaintiff's benefit under the Agreement.

107. Plaintiff is entitled to an order voiding the transfer of the Note Payment SM Stock to the Trust and requiring the return of the shares to Madhu's personal name, where they may be transferred to Plaintiff in accordance with the Agreement.

## COUNT V
### Constructive Trust
(*Against All Defendants*)

108. Plaintiff repeats and re-alleges each and every allegation set forth in the preceding paragraphs as if fully set forth herein.

109. Madhu and Plaintiff had a close personal and business relationship extending over many years. Madhu and Plaintiff were friends. Plaintiff sold his own shares and lent Madhu $7,750,000 in reliance on Madhu's promise to reserve and transfer the Note Payment SM Stock to Plaintiff.

110. Madhu repeatedly promised Plaintiff that the shares were "secure," "ring fenced," and "reserved" for Plaintiff. Madhu assured Plaintiff that "your shares are secure" and that the Note Payment SM Stock was "parked alongside shares for my kids in my trust."

22

111.    In reliance on Madhu's promises, Plaintiff continued to perform under the Agreement, including executing the Amendment reducing the principal, and refrained from taking legal action.

112.    Madhu has been unjustly enriched by retaining the Note Payment SM Stock—likely worth many multiples higher than the exercise price—while having received and kept Plaintiff's $7,750,000.

113.    Under the circumstances, it would be unjust and inequitable to permit Madhu and/or the Trust to retain the Note Payment SM Stock. Plaintiff is entitled to the imposition of a constructive trust over the 2,500,000 shares of Note Payment SM Stock for Plaintiff's benefit.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff Pavlo Protopapas respectfully requests that this Court enter judgment in his favor and against Defendants as follows:

a. An order requiring Defendants to place 2,500,000 shares of Socure, Inc. common stock (the Note Payment SM Stock) in escrow with a neutral escrow agent, or with the Court, pending the occurrence of a Qualified IPO or the lifting of transfer restrictions on Transfer Stock;

b. An order compelling Defendant Madhu to cause the return of the Note Payment SM Stock from the Trust to Defendant Madhu's personal name, or directly to Plaintiff;

c. An order of specific performance requiring Defendant Madhu to transfer the 2,500,000 shares of Note Payment SM Stock to Plaintiff upon the occurrence of a Section 2(a)(ii) event, or immediately if the Court determines Plaintiff is entitled to immediate transfer;

d. A declaratory judgment that (a) Defendant Madhu is in breach of the Agreement; (b) Events of Default have occurred; (c) Plaintiff's right to enforce the share transfer under Section 6(c) is vested; (d) the transfer of the Note Payment SM Stock to the Trust violated Section 5(a); and (e) Defendant Madhu is obligated to cause the return of or transfer of the Note Payment SM Stock to Plaintiff;

e.     An order voiding the transfer of the Note Payment SM Stock to the Trust as a fraudulent conveyance under New York law;

f.     An order imposing a constructive trust over the Note Payment SM Stock for Plaintiff's benefit;

g.     An award of disgorgement of profits and/or proceeds received by Defendant Madhu from the sale of shares from the Trust, including approximately $6,500,000 in proceeds from the sale of 1,450,000 shares to Industry Ventures and approximately $2,000,000 in proceeds from the sale 500,000 shares to Commerce Ventures;

h.     An award of Plaintiff's reasonable attorneys' fees, costs, and expenses pursuant to Section 6(c) and Section 13 of the Agreement;

i.     Pre-judgment and post-judgment interest at the applicable statutory rate; and

j.     Such other and further relief as this Court deems just and proper.

## DEMAND FOR JURY TRIAL

Plaintiff hereby demands a trial by jury on all issues so triable.

Dated: April 1, 2026

Respectfully submitted,

By: _____

Shomik Ghosh
Evan Bianchi
Joseph M. Esposito
Alex Penchuk
**SPIRO HARRISON & NELSON**
100 Pearl Street, Suite 1803
New York, NY 10004
sghosh@shnlegal.com
ebianchi@shnlegal.com
jesposito@shnlegal.com
apenchuk@shnlegal.com

*Attorneys for Plaintiff*

24